## K.B. *vs.* D.B. & another.[1]

No. 91-P-1224.

Suffolk. January 8, 1993. - September 9, 1994.

Present: ARMSTRONG, GILLERMAN, & IRELAND, JJ.

*Estoppel. Paternity. Legitimacy. Public Policy.*

Discussion of cases outside Massachusetts considering whether a husband who had voluntarily supported a child, born to his wife during their marriage but fathered by another man, is estopped from raising the defense of nonpaternity in a proceeding seeking child support. [268-272]

In actions for separate support and divorce arising from circumstances in which a husband had voluntarily supported a child, born to his wife during their marriage but fathered by another man, prior to learning conclusively that he was not the father, the judge did not err in concluding that the husband was not estopped to raise the defense of nonpaternity. [272-275]

CIVIL ACTION commenced and complaint for divorce filed in the Suffolk Division of the Probate and Family Court Department on February 5, 1987, and November 4, 1987, respectively.

The cases were consolidated for trial and heard by *Elaine M. Moriarty*, J.

*Maren Robinson* for the wife.

*Anthony W. Neal* for the husband.

*Marilyn Ray Smith*, Special Assistant Attorney General, & *Linda Swain Minkoff*, for Massachusetts Department of Revenue Child Support Enforcement Division, amicus curiae, submitted a brief.

ARMSTRONG, J. K.B., the husband, and D.B., the wife, were married September 25, 1977. A child, whom we call Sally, was born to D.B. on October 20, 1980. K.B., although

---

[1]The Department of Revenue, intervener.

doubting that Sally was his child, undertook nevertheless to act as father. The birth certificate so stated, and Sally went by the family name. A court-ordered blood test in 1987 established that K.B. could not be Sally's father. Rejecting D.B.'s contention (supported by the Department of Revenue) that K.B. should be estopped to assert his nonpaternity, a judge of the Probate Court dismissed D.B.'s action for separate support and, in K.B.'s divorce action, ruled that he was not Sally's father and had no obligation for child support. D.B. and, in the support action, the Department of Revenue, appeal from the judgments.

Because the judge's decision not to apply estoppel was in effect, a conclusion of fact, *Simon* v. *Simon*, 35 Mass. App. Ct. 705, 712 (1994), we sketch out the facts, as found by the judge, in some detail. After marrying, the parties stayed together for two years, roughly, separating in August, 1979. In late January, 1980, during the separation, the wife had sexual intercourse with another man who is presumably Sally's biological father. On February 8, 1980, after a phone call from the wife, K.B. spent the night with D.B. and they had sexual intercourse. D.B. told K.B. of her affair with the other man a few weeks before. On February 11, 1980, D.B. telephoned K.B. to say that she was pregnant. K.B. expressed doubt that he was the father, based both on the short time span from February 8 and on the fact that numerous instances of unprotected sex during their two years of married life together had failed to produce a pregnancy. K.B. urged abortion from the start; D.B., insisting K.B. was the father, resisted. In April she had ultrasound tests which showed that the pregnancy was of either ten or twelve weeks duration (the testimony is conflicting). The husband was told that ultrasound could not pinpoint the onset of the pregnancy precisely within the critical two or three week span, but he was told (according to D.B.) by a clinic doctor that there was a 99.9 percent chance he was the father. A clinic nurse testified that D.B. expressed uncertainty whether K.B. was the father. During the pregnancy, the judge found, D.B. told K.B.'s sister that a third party was the biological father. K.B.

underwent fertility tests, but they did not exclude him as Sally's father.

D.B. refused blood tests prior to 1985. That year one was ordered by a District Court judge in a nonsupport action brought by the Department of Revenue. For reasons that are disputed, the wife did not appear, and the husband had to pay ninety dollars for the missed appointment. It was not until a probate judge ordered blood tests in 1987 that K.B. learned conclusively that he was not the father.[2]

As mentioned above, K.B., despite his doubts and his inability to persuade D.B. to have an abortion, had determined by the end of the pregnancy to play the role of father. He attended Sally's birth, appeared as father on the birth certificate, arranged for Sally's baptism, and selected her godfather. For two years after Sally's birth, she and D.B. lived in K.B.'s Cambridge apartment. (K.B. vacated the apartment during D.B.'s pregnancy, and, while he may have spent time with D.B. there, the marriage never resumed in any meaningful sense and the parties were often apart.) K.B. purchased presents and baby supplies when Sally was born and Christmas and birthday gifts for about five years. He provided Sally with financial and emotional support, love, and affection. He sent her cards and purchased presents. One Christmas present was a toy box he made himself which he filled with toys. Cards were signed, "Love, Daddy" and addressed, "To my Dearest Daughter." K.B. signed an application for Sally's enrollment in school on which he was listed as the father, and D.B. was listed as the person to contact in an emergency. Between 1983 and 1986 K.B. frequently took Sally for the weekend; K.B.'s sister complained to D.B. that

---

[2]The judge who ordered the test did so, according to the affidavit of the wife's then attorney, in the mistaken belief that the parties were not married. The judge expressed regret for having done so, denied the husband's motion to dismiss the wife's action for separate support based on the results, and ruled that the blood tests would not be admissible in the husband's divorce action. The trial judge declined to follow the latter ruling.

During the trial the wife testified, and the judge found, that when the subject of ordering the blood test came on for hearing, she acquiesced, despite the objection of her then attorney; thus, the order for the blood test was one entered, in effect, by consent.

she ended up babysitting. Sally called K.B.'s sister "Auntie." Sally sometimes stayed at K.B.'s mother's house and participated in family events. K.B. visited Sally in the hospital when she had pneumonia. Once he responded to a telephone call from Sally at 3 A.M., claiming that she had been left alone. (He went to the apartment, but D.B. was there by the time he arrived. K.B. filed a neglect report under G. L. c. 119, § 51A.)

K.B. testified that, in the critical years after Sally's birth, he furnished support in the amount of twenty-five dollars per week, apparently to supplement support she was receiving from welfare. (The record does not specify who was paying the rent for the Cambridge apartment.) He also responded to some of her emergency needs for money. The judge found that K.B. furnished this support "because if [Sally] were his daughter he wanted to do the right thing and because he was informed he had a legal obligation to do so." Despite this support, nonsupport complaints were filed in 1983 and 1985. Of the latter we are told that the Department of Revenue was claiming support payments for the entire period 1980-1985; that K.B. was ordered to pay fifty dollars in weekly support, apparently on a temporary order; and that the case was dismissed after four months due to the wife's failure to appear to prosecute. (This was the proceeding, mentioned earlier, in which D.B. was ordered to submit to a blood test but missed the appointment.) When D.B. filed the present complaint for separate support in 1987, K.B. was ordered to (and did) pay ninety dollars per week, from March 12, 1987, on a temporary order, which remained in effect, notwithstanding the blood test, until July 1, 1991, when the judge entered her findings and rulings.[3]

*Discussion.* Apart from considerations of estoppel, "[a] married man should have no duty to support a child born to his wife during their marriage but fathered by another man, any more than a wife should have a duty to support a child fathered by her husband during their marriage but born of

---

[3]The separate support and the divorce actions were tried together in late February, 1991.

another woman." *Symonds* v. *Symonds*, 385 Mass. 540, 544 (1982). The only meritorious question properly before us is whether the judge erred in ruling that K.B. was not estopped to raise the defense of nonpaternity.[4]

On that question — whether one may lay down the burdens of fatherhood after voluntarily taking them on — State courts nationally have reached divergent results. None, so far as we have found, absolutely precludes estoppel. Some are very ready to apply it. See the leading case of *Clevenger* v. *Clevenger*, 189 Cal. App. 2d 658, 664 (1961) ("There is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon, his bastardy"). See also *Commonwealth ex rel Gonzalez* v. *Andreas*, 245 Pa. Super. 307, 312 (1976) ("Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized"). Other courts, however, such as *Knill* v. *Knill*, 306 Md. 527 (1986), hold estoppel is to be applied only sparingly. The first group tend to focus on the loss to the child when the volunteer father asserts nonpaternity ("To be designated as an illegitimate child in

---

[4]Two questions relative to blood tests have also been argued by D.B., the department, or both: first, whether the motion judge should have ordered the blood testing; and, second, whether the trial judge erred in allowing the results to be used in the trial. The first was waived in the trial court, see note 2 *supra*. D.B.'s waiver was express, and if the department was a party at the time the blood test was ordered, it did not preserve the issue by registering an objection. At least two State courts have refused to look at the results of blood tests administered over objection, and proving a defendant's nonpaternity, until the trial court determines that the child's best interests would be served by ordering the blood tests. See *In re Marriage of Ross*, 245 Kan. 591, 602 (1989); *Michael K.T.* v. *Tina L.T.*, 182 W. Va. 399 (1989). In *A.R.* v. *C.R.*, 411 Mass. 570, 576 (1992), the Supreme Judicial Court indicated that blood tests should be ordered if there is probable cause to believe the presumed father is not the biological father. That test is met here. The second issue was, we think, wholly disposed of by the *Symonds* decision, cited in the text above, at least in the absence of proper objections to the administration of the blood tests. *Symonds* v. *Symonds*, 385 Mass. at 542-543.

preadolescence is an emotional trauma of lasting conse-
quence. Having placed the cloak of legitimacy upon the
child, having induced the child to rely upon its protection,
the husband by abruptly removing it surely harms the child."
*Clevenger* v. *Clevenger*, 189 Cal. App. 2d at 671[5]). The sec-
ond focuses on not discouraging husbands from voluntarily
assuming the role of father to illegitimate children born to
their spouses ("Such conduct is consistent with this State's
public policy of strengthening the family, the basic unit of
civilized society. We encourage spouses to undertake, where
feasible, the support, guidance, and rearing of their spouse's
children," *Knill* v. *Knill*, 306 Md. at 538-539; "[t]his type of
family relationship should be encouraged rather than dis-
couraged through the possible consequence of becoming per-
manently financially obligated for child support." *In re Mar-
riage of A.J.N. & J.M.N.*, 141 Wis. 2d 99, 106 [1987]). The
common aim of the two groups is to foster the raising of ille-
gitimate children within the protective wing of the family
unit. The second group does so by encouraging husbands to
assume the role of father voluntarily. The other does so by
discouraging husbands from relinquishing that role.

The two groups diverge in their application of the techni-
cal elements of estoppel. These are usually stated as repre-
sentation, reliance, and detriment. *Turnpike Motors, Inc.* v.
*Newbury Group, Inc.*, 413 Mass. 119, 123 (1992). *Cellucci*
v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 728 (1974), *S.C.*, 368
Mass. 811 (1975). *National Med. Care, Inc.* v. *Zigelbaum*,
18 Mass. App. Ct. 570, 580 (1984). The first two are rarely
in issue, the first being the husband's representations to the
child, by words, deeds, or both, that he is the father, and the
second being the child's acceptance of him as such.[6] If con-

---

[5]Contrast *NPA* v. *WBA*, 8 Va. App. 246, 253-254 (1989) ("[T]he child
suffered no detriment by having been cared for and supported during the
five-year relationship where no legal duty to do so existed. In fact, the
child has received the benefit of the husband's love and support").

[6]There is a cluster of cases, however, where the child is so young at the
time the husband renounces the role of father that he or she is held not to
have relied on the husband's paternity in any meaningful sense. These in-
clude *A.R.* v. *C.R.*, 411 Mass. 570 (1992), which is discussed later in the

fined to financial considerations, detriment, i.e., an adverse change of position resulting from the justified reliance, is the stumbling block, because it is rarely found that the husband's past provision of financial support has worsened the wife's and child's claim on other sources of support, including the biological father.[7] The line of cases discouraging findings of estoppel in this context tend, in fact, to confine their analysis of detriment to financial factors. See, e.g., *Knill* v. *Knill*, 306 Md. at 536-538; *Wiese* v. *Wiese*, 699 P.2d 700, 702 (Utah 1985). "To prove equitable estoppel, the custodial parent has the burden to establish not only representation of support and reliance but also detriment, i.e., that the children will suffer future financial detriment as a result of the stepparent's representation or conduct that caused the children to be cut off from their natural parent's financial support." *Miller* v. *Miller*, 97 N.J. 154, 168-169 (1984). In contrast, the line of cases favoring estoppel in this context tends to focus on the psychological or emotional impact on the child on learning that the man he or she thinks of as father is denying paternity. See, e.g., *Clevenger* v. *Clevenger*, 189 Cal. App. 2d at 671; *M.H.B.* v. *H.T.B.*, 100 N.J. 567, 574-577 (1985) (equally divided court); *Commonwealth ex rel Gonzalez* v. *Andreas*, 245 Pa. Super. at 312; as well as the dissenting opinion of Murphy, C.J. in *Knill* v. *Knill*, 306 Md. at 546 ("nothing could be more devastating to the fragile psy-

---

text, as well as *Albert* v. *Albert*, 415 So. 2d 818, 820 (Fla. Dist. Ct. App. 1982); *Berrisford* v. *Berrisford*, 322 N.W.2d 742, 745 (Minn. 1982); *S.E.M.* v. *D.M.M.*, 664 S.W.2d 665, 667 (Mo. Ct. App. 1984). But see *Michael K.T.* v. *Tina L.T.*, 182 W. Va. 399 (1989) (estoppel permissible even where child was thirteen months old at husband's renunciation of paternity).

[7]An exception is *Miller* v. *Miller*, 97 N.J. 154 (1984), where the possibility of estoppel against the husband seems to have been predicated on his having forced the family to turn back support offered by the natural father and to lose contact with him. See also *Johnson* v. *Johnson*, 93 Mich. App. 415, 419-420 (1979) (by marrying mother knowing she was pregnant, husband under Michigan statute foreclosed resort to biological father for support; husband estopped to deny paternity); *Nygard* v. *Nygard*, 156 Mich. App. 94 (1986) (having persuaded mother during pregnancy to forgo putting child up for adoption when born and instead to marry him and let him act as father, husband was estopped from disclaiming paternity).

chology of a child than the sudden breach of a long-established paternal relationship followed by being proclaimed a bastard and left without a father. To trivialize harm so profound in its effect by requiring financial or economic detriment as a necessary ingredient of estoppel is beyond all reason").

The judge put her decision in K.B.'s favor on three grounds: (1) the absence of a showing of financial, as opposed to emotional, detriment; (2) the lack of a knowing misrepresentation by K.B.[8]; and (3) the desirability of encouraging husbands in this situation, as well as stepfathers and adults in stable cohabitation arrangements, to assume voluntarily support of children without the fear that doing so may obligate them permanently. In effect, the judge in her third reason sided with what has been characterized as the view of a majority of State appellate courts that have considered the matter. *Knill* v. *Knill*, 306 Md. at 532.[9]

Subsequent to the trial judge's decision in this case, the Supreme Judicial Court addressed the issue for the first time. In *A.R.* v. *C.R.*, 411 Mass. 570 (1992), a husband was held not estopped to deny paternity in a divorce proceeding, the two children being then two and one-half years and one year old; "it is doubtful that either child relied in any meaningful sense on any representation of paternity that the husband

---

[8]The judge, in other words, treated as significant the fact that K.B. at all times thought that he *might be* the biological father. Estoppel, however, is sometimes found even in the absence of a knowing misrepresentation. See *McLearn* v. *Hill*, 276 Mass. 519, 525 (1931); *Looney* v. *Trimont Theatres, Inc.*, 282 Mass. 275, 278 (1933). Because we affirm the judge based on her third reason, we are not required to consider whether K.B.'s uncertainty by itself should enable him to avoid estoppel.

[9]Decisions that would support the judge's rejection of estoppel in this context include, in addition to *Knill* v. *Knill, supra*; *Remkiewicz* v. *Remkiewicz*, 180 Conn. 114, 119-120 (1980); *Carter* v. *Delaware Bureau of Child Support Enforcement*, 444 A.2d 271 (Del. 1982); *Fuller* v. *Fuller*, 247 A.2d 767, 769-770 (D.C. 1968); *R.D.S.* v. *S.L.S.*, 402 N.E.2d 30, 33-35 (Ind. Ct. App. 1980); *Miller* v. *Miller*, 97 N.J. at 168; *Wiese* v. *Wiese*, 699 P.2d at 702-703; *NPA* v. *WBA*, 8 Va. App. 246 (1989); and *In re Marriage of A.J.N. & J.M.N.*, 141 Wis. 2d at 106. See also *Albert* v. *Albert*, 415 So. 2d 818 (Fla. Dist. Ct. App. 1982); *Hippen* v. *Hippen*, 491 So. 2d 1304 (Fla. Dist. Ct. App. 1986).

may have made." 411 Mass. at 574-575. The decision was put on a broader ground, however, mirroring the third reason[10] given by the judge and the view of many, perhaps a majority of, State appellate courts:

> "We would proceed with caution, as other courts have, in imposing a duty of support on a person who has not adopted a child, is not the child's natural parent, but has undertaken voluntarily to support the child and to act as a parent. See *Knill* v. *Knill, supra* at 538-539; *Marriage of A.J.N. & J.M.N.*, 141 Wis. 2d 99, 106 (1987). In most instances, such conduct should be encouraged as a matter of public policy. The obligation to support a child primarily rests with the natural parents, and one who undertakes that task without any duty to do so generally should not be punished if he or she should abandon it. On the other hand, a husband who for years acts as a father to a child born to the wife, supports that child, and holds himself out as the father to the child and to the world, may be obliged to continue to support the child when he, for the first time, renounces his apparent paternity in an attempt to avoid court-imposed support obligations. It may be relevant, in deciding whether reliance was detrimental, to know whether there once was an opportunity to pursue the natural father that is now lost. See *Miller* v. *Miller*, 97 N.J. 168-169 (1984)."

*Id.* at 575.

D.B and the department argue that this case falls within the exception: a husband who for years holds himself out as father to the child and to the world, who later renounces his paternity in an attempt to avoid court-imposed support obligations. Their reading of the exception, however, would permit it to vitiate the principal thrust of *A.R.* v. *C.R.*: encour-

---

[10]*A.R.* v. *C.R.* expressly avoided intimating a view whether emotional detriment, without any showing of economic detriment, could be sufficient to support an estoppel. 411 Mass. at 575.

aging husbands in K.B.'s position to assume the role of fathers by not attaching permanent obligation to that choice. That policy has been reiterated in *Liebson* v. *Liebson*, 412 Mass. 431, 434 (1992).

The department and D.B. argue that the facts of this case fall outside the express terms of what we identify as the principal ruling of *A.R.* v. *C.R.*: that is to say, they argue K.B. cannot be regarded as one who, without obligation to do so, furnished support on a voluntary basis because, as D.B.'s husband, he was Sally's presumptive father,[11] and, as such, he had a legal duty of support until he proved he was not the child's biological father. But this is a classic example of an argument that proves too much; it would largely exclude husbands from the class subject to the policy of encouraging support of illegitimate children, losing sight of the fact that husbands are its principal focus and that C.R., to whom the rule applied, was himself in that category.

Moreover, as to the exception, K.B. cannot be considered one who, after years of holding himself out to the child and to the world as father, *"for the first time* . . . renounces his apparent paternity in an attempt to avoid court-imposed support obligations." *A.R.* v. *C.R.*, 411 Mass. at 575. From the onset of D.B.'s pregnancy K.B. asserted, and attempted to prove, his nonpaternity. He denied paternity on learning of the pregnancy; attempted to convince D.B. to have an abortion; underwent fertility testing in an inconclusive attempt to disprove his paternity; sought medical opinion at the time of the ultrasound testing as to the likelihood of his being the father based on fetal age; and asserted his nonpaternity defensively in each of the three proceedings (1983, 1985, 1987)

---

[11]Some language in *C.C.* v. *A.B.*, 406 Mass. 679, 686, 688 (1990), could be read as eliminating any presumption of legitimacy of a child born to a lawfully wedded mother. The sense of the decision, however, is that it (1) abolishes a *conclusive* presumption of legitimacy and (2) permits proof by clear and convincing evidence (as contrasted with evidence beyond a reasonable doubt) that the husband is not the father. Subsequent decisions continue to refer to the mother's husband as "the presumptive father." See *Matter of Walter*, 408 Mass. 584, 588 (1990). Indeed, such a presumption is expressly established by G. L. c. 209C, § 6(*a*)(1).

against him for nonsupport. He sought blood tests repeatedly, which were resisted by D.B. until the present action.

Sally was apparently six when K.B. stopped acting as her father. Clearly this case involves psychological considerations not present in *A.R.* v. *C.R.*, where the eldest child was two and one-half.[12] To rule, however, that the exception applies whenever a child has reached an age when he or she could have a meaningful appreciation of paternity would make the exception the rule and the "rule" applicable only to one and two year olds. In light of the cautionary policy of *A.R.* v. *C.R.* and *Liebson* v. *Liebson*, we cannot say that the judge erred in finding no estoppel. We realize that some judges might have drawn a different conclusion from the facts of this case; but estoppel, in the last analysis, is a conclusion of fact, not law, *Simon* v. *Simon*, 35 Mass. App. Ct. at 712, and as to conclusions of fact an appellate court will normally reverse only where the conclusion is one that no reasonable view of the facts would support. See *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 429-430 (1980); *Trempe* v. *Aetna Cas. & Sur. Co.*, 20 Mass. App. Ct. 448, 452 (1985). This is not such a case; to the contrary, the conclusion reached by the judge was the one many courts would have reached on similar findings.

The judge ordered the department to reimburse K.B. for the support payments he was required to make after the denial of his motion for relief from the support order, from the time that the department was permitted to intervene (and was thus on notice that reimbursement was sought), to the dissolution of the order when the judge entered her decision. The department has argued only that the judge should have found estoppel, not that reimbursement was an inappropriate

---

[12]The judge's findings make clear that she appreciated the emotional toll that would naturally be exacted on a child Sally's age by severence of the father-daughter relationship. In her discretion she could properly decline to appoint an expert to expand on the psychological effects.

remedy if estoppel were not applied. No issue is presented here as to reimbursement.

*Judgments affirmed.*