DIANNA L. QUINTELA, APPELLEE, v. PEDRO I. QUINTELA, APPELLANT.

544 N.W.2d 111

Filed February 27, 1996. No. A–95–086.

Karen L. Vervaecke for appellant.

No appearance for appellee.

HANNON, IRWIN, and MILLER–LERMAN, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Pedro I. Quintela appeals from a divorce decree which ordered him to pay child support for a minor child born during the parties' marriage but who paternity tests establish is not his biological child. We find that Pedro was not provided with a full and fair hearing on the issue of paternity, and we therefore reverse, and remand for further proceedings.

## II. FACTUAL BACKGROUND

The bill of exceptions in this case is 11 pages long and reveals the following facts:

Dianna L. Quintela and Pedro I. Quintela were married on June 21, 1986, in Jackson County, Mississippi. Both parties were in the Navy at the time. After their marriage, Pedro's ship was sent to Scotland, and Dianna moved to Virginia Beach, Virginia. Pedro returned to Virginia in 1987 and resumed living with Dianna.

Joshua Quintela was born on January 12, 1991. Dianna testified that the parties stopped living together in mid–1991. In December 1992, Dianna and Joshua moved to Nebraska.

On October 13, 1993, Dianna filed a petition for legal separation and alleged that Pedro was Joshua's father. On January 5, 1994, Dianna amended her filing to a petition for dissolution and again alleged that Pedro was Joshua's father. Pedro filed an answer and cross–petition on March 11, denied

that he was Joshua's father, and requested a blood test to determine paternity. On March 21, Dianna filed a reply and affirmatively alleged that Pedro was Joshua's father.

According to the court's docket sheet, the matter was set for trial on October 6, 1994, on the court's own motion. The bill of exceptions reflects that when the matter was called by the court on October 6, the following colloquy ensued:

THE COURT: Court is considering Quintela vs. Quintela at Docket 9369, Page 1396. Petitioner is present with counsel. Respondent present by counsel. Is this resolved?

MS. WAGEMAN [Dianna's counsel]: Yes, it is. Only thing we are going to do is prove up on it. We still have to send the decree down to the respondent.

Dianna appeared with her counsel, and Pedro's counsel appeared. Although a guardian ad litem had been appointed to represent Joshua's interests, the guardian was not present at trial. It is uncontroverted that the parties believed they had resolved the issues prior to trial, and Dianna appeared merely to "prove up" the petition. In fact, regarding issues surrounding the child, Dianna's counsel questioned her as follows:

Q The respondent has denied that he is the biological father of this child?

A Right.

Q You and the respondent and your child voluntarily underwent paternity testing; correct?

A Right.

Q The results of that test indicated that in fact the respondent is not the biological father.

A Right.

Q So you understand today that the Court is not making any findings regarding issues of child custody between you and the respondent.

A Yes.

Pedro's counsel questioned Dianna as follows: "Q You and Pedro have agreed he is not the father and he is forever barred from seeing the child? A That's correct."

The results of the paternity test were received by the court. The test indicated that there was a "0.0" percent chance that

Pedro was Joshua's father. According to the test results, Pedro "lack[ed] the genetic markers that must be contributed to [Joshua] by the biological father," and Pedro was thus "excluded as the biological father of [Joshua]." According to Dianna's testimony, the parties all agreed that Pedro is *not* Joshua's father.

After the petition had been proven by examination of Dianna, the court examined Dianna regarding the relationship between Pedro and Joshua. Dianna testified that she had thought someone other than Pedro was Joshua's father when she was pregnant. Dianna further testified that she informed Pedro he was not Joshua's father, although she did not testify as to when she so informed him. Dianna testified that she knew the biological father's name, although she never maintained a paternity action against him and testified that she did not know where he was at the time of trial.

Dianna testified that she had furnished the hospital Pedro's name as the father, although she knew Pedro was not the father. She also testified that Pedro had treated Joshua as his child "[u]ntil right after Josh's first birthday when [the parties] split up." Pedro had stopped visiting Joshua after Dianna and Joshua moved to Nebraska, although Dianna testified that Pedro had called and sent birthday cards to Joshua. Dianna testified that Pedro had sent support for her and Joshua until February 1994.

During the trial, the court expressed concern over Joshua's best interests. The court suggested that Pedro should be obligated to support Joshua despite the paternity test results. On December 21, 1994, the court entered a decree of dissolution. The court found that Pedro "has acknowledged paternity of [Joshua] and therefore . . . both parties are estopped from denying paternity of [Joshua] and [Joshua] is a child born from the marriage" of Pedro and Dianna. The court ordered Pedro to pay $335 in child support per month. On October 19, Pedro had filed a "Motion to Hear Additional Evidence" with a supporting affidavit of counsel which stated that it was counsel's understanding that no trial had been necessary because matters had been resolved between the parties. This motion was denied. A motion for new trial was also filed. This was also denied by the court. This appeal followed.

### III. ASSIGNMENTS OF ERROR

In this appeal, Pedro assigns three errors, which we have consolidated for discussion to one: The district court erred in determining paternity and ordering Pedro to pay child support for a minor child who is not his biological offspring.

### IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995).

### V. ANALYSIS

This case presents us with the question of whether a husband has a legal duty to support a child born during the course of the marriage when paternity tests conclusively demonstrate that he is not the child's biological father.

#### 1. CHOICE OF LAW

We note at the outset that there was a potential conflict-of-laws problem in this case. Joshua was born and lived together with Pedro and Dianna for a period of time in Virginia. Some of the actions upon which the trial court appears to have based Pedro's support obligation occurred in Virginia. At the time of trial, Pedro was a resident of Texas, and Dianna and Joshua were residents of Nebraska. Although any of these three states may have had an interest in having its law applied to this case, the parties did not raise at trial and do not raise on appeal the issue of which state's law should apply. It appears that Nebraska has the most significant relationship to the case and, correspondingly, the most significant interest in having its law applied to the case. See Restatement (Second) of Conflict of Laws §§ 6 and 287 (1971). However, even if Virginia or Texas law was deemed to control the case, no presentation was made to the trial court concerning what Virginia or Texas law is on the subject of paternity. Under such circumstances, we presume the common law and statutory law of other jurisdictions to be the same as the law of Nebraska. See, *Gruenewald v. Waara*,

229 Neb. 619, 428 N.W.2d 210 (1988); *Buckingham v. Wray*, 219 Neb. 807, 366 N.W.2d 753 (1985); *Abramson v. Abramson*, 161 Neb. 782, 74 N.W.2d 919 (1956).

## 2. PATERNITY OF JOSHUA

### (a) Presumption of Legitimacy

 In Nebraska, a child born during wedlock is presumed to be the legitimate offspring of the married parties. See, e.g., *Ford v. Ford*, 191 Neb. 548, 216 N.W.2d 176 (1974); *Cavanaugh v. deBaudiniere*, 1 Neb. App. 204, 493 N.W.2d 197 (1992). The presumption of legitimacy is not an irrebuttable presumption, however, and it may be rebutted by clear, satisfactory, and convincing evidence. *Ford v. Ford, supra*; *Cavanaugh v. deBaudiniere, supra*. This court noted in *Cavanaugh* that blood tests may be used to rebut the presumption that the husband is the biological father of children born during wedlock.

In the present case, a paternity test was voluntarily consented to by the parties. The test resulted in a medical determination that Pedro is not Joshua's father. Specifically, the test revealed that there was a "0.0" percent possibility that Pedro could be Joshua's father. The paternity test results provided clear, satisfactory, and convincing evidence to rebut the presumption that Pedro is Joshua's father. As a result, in the present case an obligation of child support cannot be premised on the legal presumption that Pedro is Joshua's father.

### (b) In Loco Parentis

 In the absence of a biological or adoptive relationship between a husband and his wife's child, the Nebraska Supreme Court and this court have recognized that certain rights and responsibilities may arise where a husband elects to stand in loco parentis to his wife's child. See, *Hickenbottom v. Hickenbottom*, 239 Neb. 579, 477 N.W.2d 8 (1991); *Austin v. Austin*, 147 Neb. 109, 22 N.W.2d 560 (1946); *Cavanaugh v. deBaudiniere, supra*. The Nebraska Supreme Court has held:

" 'A person standing in loco parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation,

> without going through the formalities necessary to a legal adoption, and the rights, duties, and liabilities of such person are the same as those of the lawful parent. The assumption of the relation is a question of intention, which may be shown by the acts and declarations of the person alleged to stand in that relation.' . . ."

*Hickenbottom v. Hickenbottom*, 239 Neb. at 592, 477 N.W.2d at 17 (quoting *Austin v. Austin, supra*).

As indicated by this court, it is a husband's desire to remain in an in loco parentis relationship with his wife's child that gives rise to the rights and corresponding responsibilities usually reserved for natural or adoptive parents. See *Cavanaugh v. deBaudiniere, supra* (cause remanded for determination of ex-husband's desire to continue in loco parentis relationship with ex-stepchild). As a corollary, termination of the in loco parentis relationship also terminates the corresponding rights and responsibilities afforded thereby. See, e.g., *id.*; *Jackson v. Jackson*, 278 A.2d 114 (D.C. 1971) (trial court erred in ordering support when husband demonstrated intent to end in loco parentis relationship); *Portuondo v. Portuondo*, 570 So. 2d 1338 (Fla. App. 1990) (when in loco parentis relationship terminated, support obligation terminated).

In the present case, Pedro and Joshua shared the same household for less than 1 year. Assuming, arguendo, that Pedro did assume such an in loco parentis relationship, his denial of paternity and challenge to Dianna's request for child support demonstrate that Pedro now wishes to terminate the relationship. Some jurisdictions consider such a relationship automatically terminated upon dissolution of the marriage between the parties. See, *Jackson v. Jackson, supra* (absent intention otherwise, in loco parentis relationship terminates upon divorce in most jurisdictions); *Portuondo v. Portuondo, supra* (dissolution of marriage terminates in loco parentis relationship); *E.H. v. M.H.*, 512 N.W.2d 148 (S.D. 1994) (responsibilities of in loco parentis relationship terminate upon dissolution of marriage). Because it is within Pedro's power to terminate the in loco parentis relationship, and because Pedro has made it clear that he does not desire such a relationship in the present case, an obligation to support Joshua cannot be

premised on the existence of an in loco parentis relationship between Pedro and Joshua.

### (c) Acknowledgment

In the decree, the trial court found that Pedro "has acknowledged paternity of [Joshua]." The Nebraska paternity statutes do provide that paternity may be established by acknowledgment. See, e.g., Neb. Rev. Stat. § 43–1401 et seq. (Reissue 1993 & Cum. Supp. 1994). If paternity is established by acknowledgment, a man is liable for support in the same manner as if the child had been born in lawful wedlock. § 43–1402.

Prior to July 1, 1994, the Nebraska statutes provided that a person could be found to have acknowledged paternity either by stating in writing that he is the father of the child or by performing acts, such as furnishing support, which reasonably indicated that he considered himself to be the father. See § 43–1409 (Reissue 1993). The statute was amended, however, and as of July 1, 1994, an alleged father can be found to have acknowledged paternity only if he executes a notarized writing indicating that he considers himself to be the father. § 43–1409 (Cum. Supp. 1994).

In the present case it is not alleged, and the evidence does not suggest, that Pedro has executed any written acknowledgment of paternity. Based on Dianna's testimony and the language of the decree, it appears the court may have based its finding of paternity and obligation to support Joshua on a belief that Pedro acknowledged paternity by performing acts, such as furnishing support, indicating that he considered himself to be Joshua's father. Because Pedro allegedly performed these acts prior to the operative date of the amendment of § 43–1409, Pedro may be deemed to have acknowledged paternity under § 43–1409 (Reissue 1993) if he in fact performed acts, such as furnishing support, indicating that he considered himself to be Joshua's father.

The problem with the district court's finding that Pedro acknowledged paternity of Joshua is not that it was an erroneous conclusion based on the evidence before the court, but, rather, that it was made as a result of a hearing at which neither party

anticipated Pedro's paternity of Joshua would be an issue. Because paternity tests had demonstrated conclusively that Pedro was *not* Joshua's biological parent, it is clear that Pedro, Dianna, and Joshua's guardian ad litem anticipated that paternity and child support obligations would not be at issue. Dianna appeared at trial merely to "prove up" the petition, and Pedro, apparently in the belief that all matters were settled, did not personally appear. Additionally, the guardian ad litem did not appear. The district court, in an appropriate attempt to protect Joshua's best interests, raised the issue of paternity on its own motion.

The Nebraska Supreme Court has held that to comply with the requirements of procedural due process, a person whose rights are to be affected by proceedings must be provided with notice reasonably calculated to inform the person concerning the subject and issues involved in the proceeding. *State ex rel. Grape v. Zach*, 247 Neb. 29, 524 N.W.2d 788 (1994). In addition, the requirements of due process mandate that the individual be given a reasonable opportunity to refute or defend against the charge or accusation, a reasonable opportunity to confront and cross-examine adverse witnesses, and a reasonable opportunity to present evidence on the charge or accusation. *Id.*

The record supports the conclusion that paternity and child support were not within the topics contemplated by the parties to be at issue. If Pedro is to be ordered to pay a specific liability, such as child support, as to which he may have a valid defense, he should at least receive notice and have the opportunity to be heard and present evidence on his own behalf. See *Weber v. Weber*, 203 Neb. 528, 279 N.W.2d 379 (1979). The record indicates that Pedro filed a motion requesting the court hear additional evidence on the paternity issue after the trial, but the court denied the motion. Pedro also filed a motion for new trial, which was denied by the court. Because Pedro was not provided with a full and fair hearing on the question of acknowledgment, we reverse the trial court's conclusion in this regard.

### (d) Paternity by Estoppel

#### *(i) Paternity by Estoppel in Nebraska*

The trial court also found in the decree that "both parties are estopped from denying paternity of [Joshua]." Based on Dianna's testimony and the language of the decree, it is possible the court may have based its finding of paternity and obligation to support Joshua on a theory of paternity by estoppel. Many jurisdictions, including Nebraska, have had occasion to consider the application of estoppel to paternity and child support obligation cases.

The Nebraska Supreme Court has never used paternity by estoppel to impose a support obligation on someone who is not the biological father of his ex–wife's child. In *State on behalf of J.R. v. Mendoza*, 240 Neb. 149, 481 N.W.2d 165 (1992), the court discussed the theory of paternity by estoppel. In *Mendoza*, the State brought an action against a biological father to recover support. The biological father in *Mendoza* attempted to use a theory of paternity by estoppel to suggest the mother's new husband should be estopped from denying paternity and the obligation of supporting the child.

In *Mendoza*, the court held that the doctrine of paternity by estoppel involves the application of established principles of equitable estoppel. The court held that there were six elements to a claim of estoppel:

> "The elements of equitable estoppel are, as to the party estopped, (1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position

or status of the party claiming the estoppel, to his injury, detriment, or prejudice."

*State on behalf of J.R. v. Mendoza*, 240 Neb. at 164, 481 N.W.2d at 175 (quoting *State v. Nebraska Assn. of Pub. Employees*, 239 Neb. 653, 477 N.W.2d 577 (1991)).

In *Mendoza*, the court determined that estoppel was technically inapplicable because the correct parties were not present. The *Mendoza* court questioned whether estoppel should be applied in paternity cases in Nebraska absent a demonstration that the acts of the party to be estopped have interfered with the child's ability to seek financial support from his or her biological parent. In *Mendoza*, the court reserved judgment on whether Nebraska would ever apply the doctrine of paternity by estoppel when the child has not suffered a financial detriment. The *Mendoza* court did, however, discuss a Maryland case, *Knill v. Knill*, 306 Md. 527, 510 A.2d 546 (1986), in which the Maryland court held that the doctrine applies *only* if the acts of the reputed father interfere with the child's ability to seek financial support from his or her natural parent.

### (ii) Other Jurisdictions

State appellate courts nationally have reached varying results in considering the application of estoppel to paternity cases. See *K.B. v. D.B.*, 37 Mass. App. 265, 639 N.E.2d 725 (1994) (discussing divergent results of state courts). In some jurisdictions, courts appear eager to apply the doctrine. See, e.g., *Clevenger v. Clevenger*, 189 Cal. App. 2d 658, 664, 11 Cal. Rptr. 707, 710 (1961) ("[t]here is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon his bastardy"); *Judson v. Judson*, No. FA 94 0065962, 1995 WL 476848 at *5 (Conn. Super. July 21, 1995) (denying paternity test based on estoppel theory and quoting *Clevenger v. Clevenger, supra*, that " '[t]he relationship of father and child is too sacred to be thrown off like an old cloak, used and unwanted' "); *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa. Super. 307, 312, 369 A.2d 416, 419 (1976) ("[a]bsent any overriding equities in favor of the putative father, such as fraud,

the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized"). In other jurisdictions, however, courts appear willing to apply the doctrine of paternity by estoppel only sparingly. See, e.g., *Knill v. Knill, supra* (husband not estopped from denying paternity); *K.B. v. D.B., supra* (husband not estopped from raising defense of nonpaternity); *Marriage of A.J.N. & J.M.N.*, 141 Wis. 2d 99, 414 N.W.2d 68 (1987) (husband not estopped from denying paternity and obligation to support child).

The jurisdictions which appear ready to apply the doctrine of paternity by estoppel tend to focus on the loss to the minor child when the alleged father asserts nonpaternity. The California court, in *Clevenger v. Clevenger, supra*, stated:

> We are dealing with the care and education of a child during his minority and with the obligation of the party who has assumed as a father to discharge it. The law is not so insensitive as to countenance the breach of an obligation in so vital and deep a relation, undertaken, partially fulfilled, and suddenly sundered.

189 Cal. App. 2d at 674, 11 Cal. Rptr. at 716. In contrast, the jurisdictions which only sparingly apply the doctrine tend to focus on encouraging husbands to voluntarily assume the role of father to illegitimate children born to their spouses without imposing the risk of assuming a permanent obligation of support. The Maryland court, in *Knill v. Knill*, 306 Md. 527, 538–39, 510 A.2d 546, 552 (1986), stated:

> In this case, Charles knew that Stephen was not his son and, nevertheless, treated him as his son and as a member of the Knill family. Such conduct is consistent with this State's public policy of strengthening the family, the basic unit of civilized society. We encourage spouses to undertake, where feasible, the support, guidance, and rearing of their spouses' children, so long as such conduct does not deprive the children of their right to support from their natural parents. . . . We believe that [Charles] should not be penalized for his conduct . . . .

All jurisdictions appear to have a common aim of fostering "the raising of illegitimate children within the protective wing of the

family unit." *K.B. v. D.B.*, 37 Mass. App. at 270, 639 N.E.2d at 728.

The jurisdictions favoring paternity by estoppel and the jurisdictions hesitating to apply the doctrine diverge from one another in application of the technical elements of estoppel. The elements of estoppel are usually stated as representation, reliance, and detriment. *K.B. v. D.B., supra.* The largest distinction between the two groups of jurisdictions appears to be in application of the "detriment" element. See *id.* The jurisdictions favoring paternity by estoppel tend to focus on the psychological or emotional impact on a child of learning that the man he or she thinks of as a father is now denying paternity in order to avoid a support obligation. See, e.g., *Clevenger v. Clevenger, supra*; *Judson v. Judson, supra.* In contrast, the jurisdictions hesitating to apply paternity by estoppel tend to confine their analysis of detriment to financial factors and rarely find that the husband's past provision of financial support has adversely affected the child's claim for support from his or her biological father. See, e.g., *Knill v. Knill, supra.*

### (iii) Application to Present Case

Although the Nebraska Supreme Court expressly reserved judgment on the question of whether Nebraska would ever apply paternity by estoppel when the child has suffered no financial detriment, the court's discussion in *State on behalf of J.R. v. Mendoza*, 240 Neb. 149, 481 N.W.2d 165 (1992), suggests that Nebraska will not apply the doctrine in the absence of financial detriment. After citing and discussing the Maryland opinion in *Knill v. Knill, supra*, the *Mendoza* court noted that no financial detriment was present in the case before it.

In the case before us, we find that the requisite elements of estoppel are not present regardless of whether "detriment" is construed as meaning a financial detriment or a psychological detriment. As noted above, the elements of estoppel in Nebraska are,

"as to the party estopped, (1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those

which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice."

*State on behalf of J.R. v. Mendoza*, 240 Neb. at 164, 481 N.W.2d at 175 (quoting *State v. Nebraska Assn. of Pub. Employees*, 239 Neb. 653, 477 N.W.2d 577 (1991)). We need not expressly decide whether the elements, as to Pedro, are satisfied, however, because we find that the record does not demonstrate any detriment to Joshua arising from Pedro's actions.

The record in the present case fails to establish *any* detriment to Joshua, either financial or psychological. Dianna testified that she has never maintained a paternity action against Joshua's biological father, although she testified that she does know who the biological father is. There is nothing in the record to suggest that Pedro's actions or representations, even assuming they are enough to satisfy the conduct requirements of estoppel, have in any way adversely affected Joshua's right and opportunity to seek support from his biological father. The record does not demonstrate any financial detriment.

The record reveals that Pedro and Dianna stopped living together in mid–1991. Joshua was born in January 1991. Additionally, Dianna and Joshua moved to Nebraska in December 1992, while Pedro remained in Virginia. As a result, Pedro and Joshua lived in the same home for less than 1 year and the same state for less than 2 years. Dianna testified that Pedro treated Joshua as his own child "[u]ntil right after Josh's first birthday." Regardless of what meaning is attached to Dianna's testimony that Pedro treated Joshua as his own child, the relationship between Pedro and Joshua appeared to effectively end when Joshua was only 1 year old.

The record does not indicate that Pedro and Joshua have any kind of a psychological bond. In *A.R. v. C.R.*, 411 Mass. 570, 574–75, 583 N.E.2d 840, 843 (1992), the Massachusetts Supreme Judicial Court held a husband was not estopped from denying paternity when the children were 2½ years and less than 1 year old, because it was "doubtful that either child relied in any meaningful sense on any representation of paternity that the husband may have made." Similarly, in the present case the record is devoid of any evidence that Joshua or his mother relied in any meaningful sense on any representation of paternity that Pedro may have made. The record does not support a finding of psychological detriment, even if psychological detriment is deemed enough to satisfy the elements of paternity by estoppel in Nebraska.

We find the following language from *K.B. v. D.B.*, 37 Mass. App. 265, 273, 639 N.E.2d 725, 730 (1994), to be highly persuasive:

> "We would proceed with caution, as other courts have, in imposing a duty of support on a person who has not adopted a child, is not the child's natural parent, but has undertaken voluntarily to support the child and to act as a parent. [Citations omitted.] In most instances, such conduct should be encouraged as a matter of public policy. The obligation to support a child primarily rests with the natural parents, and one who undertakes that task without any duty to do so generally should not be punished if he or she should abandon it. . . ."

(Quoting *A.R. v. C.R., supra.*) To the extent the record suggests Pedro may have voluntarily supported Joshua and acted like a parent to him, he should not be obligated to continue supporting Joshua on a theory of paternity by estoppel, absent any real detriment to Joshua from such action.

Prior to trial, a guardian ad litem had been appointed to represent Joshua's interests. The guardian, however, did not appear or testify at trial. From the record, it is clear that the parties and the guardian did not contemplate the possibility that Pedro might be estopped from denying paternity and his support obligation. As a result, although the present record does not support a finding of estoppel, it also does not demonstrate that

there is *no* possibility that a sufficient detriment, either financial or psychological, could exist and could be considered to have arisen because of reliance on a misrepresentation by Pedro. To the extent the district court premised Pedro's obligation to pay child support on a theory of estoppel, we reverse the court's conclusion in this regard. It is necessary that we remand for further proceedings to determine whether the requisite elements of paternity by estoppel exist in the event that Pedro is not found to have satisfied § 43–1409 (Reissue 1993) regarding acknowledgment. On remand, careful consideration should be given to whether or not each of the requisite elements of estoppel is satisfied in this case.

## VI. CONCLUSION

We find that Pedro was not provided with a full and fair hearing on the issues of paternity and the corresponding rights and obligations which may accompany a finding of paternity. We reverse, and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

HANNON, Judge, dissenting in part.

I agree that the trial court erred in determining paternity and in ordering Pedro to pay support for Joshua, but I do not think further proceedings are permissible or desirable. I would simply reverse with directions to determine that Joshua was not Pedro's child and to cancel the child support obligation. The record, as discussed in the opinion, establishes that the doctrine of estoppel does not apply. However, even assuming that facts could exist which would justify a finding that Pedro is estopped from denying he is Joshua's father, I would still object to either the trial court or this court framing that issue.

I realize that " '[a] court of equity, if cognizant of the facts, should, on its own motion, protect the rights of minors, when involved in litigation to which they are not parties.' " *Workman v. Workman*, 167 Neb. 857, 869, 95 N.W.2d 186, 194 (1959) (quoting *Jones v. Hudson*, 93 Neb. 561, 141 N.W. 141 (1913)). The trial judge did so by appointing a guardian ad litem. After a guardian ad litem is appointed:

In order to protect fully the infant's interest the court should exercise a general supervision over the conduct of the next friend or guardian ad litem, and determine whether such representative has in fact acted to protect his ward. The court should advise such representative as to what steps to take or what pleadings to file, and see that the infant's rights are in no way sacrificed, impaired, infringed on, or destroyed. As otherwise stated, the court must see that the infant's rights are not prejudiced or abandoned, that all proper defenses are made for him, and that he is given a fair and impartial hearing, before judgment is rendered against him.

43 C.J.S. *Infants* § 220 at 565–66 (1978).

The pleadings filed by the parties raised only the issue of whether Pedro was Joshua's biological father. Obviously, the trial judge thought Pedro should be held responsible as the child's father. In such a situation, I can see a trial judge continuing the hearing, calling the guardian ad litem before the court to see if the guardian had properly investigated and considered the matter, and in the proper case appointing a different guardian ad litem. However, with no pleadings that addressed this issue, the trial judge simply found that Pedro acknowledged paternity and "therefore . . . that both parties are estopped from denying paternity." I realize that the judge has some heavy burdens when it comes to looking after children's rights in litigation, but he or she can never lose sight of the fact that even with children's rights the judge should act as a disinterested arbiter in an adversarial system, and not an advocate. Beyond directing the guardian ad litem to perform his or her duty, I do not think either the trial court or this court should frame the issues to be tried. I think the record shows that a competent guardian ad litem would not have sought to impose parental responsibility upon Pedro.