STATE ON BEHALF OF A.E., APPELLEE, V.
CORRELL BUCKHALTER, APPELLANT.

730 N.W.2d 340

Filed April 20, 2007. No. S-06-693.

Lindsay K. Lundholm and William G. Dittrick, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, L.L.P., for appellant.

Gary Lacey, Lancaster County Attorney, and Barbara J. Armstead for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The State of Nebraska sued Correll Buckhalter on behalf of A.E., a minor child, to establish paternity and award child support. Buckhalter, however, failed to answer or otherwise appear. On December 2, 2005, 17 months after the State filed the action, and after Buckhalter failed to appear numerous times for verified genetic testing, a referee found that Buckhalter is A.E.'s father by default and recommended the district court award child support of $4,035 per month.

Buckhalter claims that (1) he did not receive notice of the evidentiary hearing, (2) an unverified, private paternity test exculpates him as the father, and (3) the evidence of his income was insufficient to award child support. We affirm because after failing to answer or appear, Buckhalter was not entitled to notice of the hearing, the unsubstantiated test results are not a meritorious defense, and the child support award is supported by the evidence.

## I. BACKGROUND

### 1. A.E.'s BIRTH AND PATERNITY TESTS

While a student at the University of Nebraska-Lincoln, Buckhalter had a sexual relationship with Jennifer Brown. In

1999, Brown gave birth to A.E. Buckhalter currently plays professional football for the Philadelphia Eagles.

Brown had sexual relationships with three men about the time A.E. was conceived, including Buckhalter. The other two men took paternity tests through the State, which excluded both of them as being A.E.'s father. In April 2004, Buckhalter and Brown arranged for private genetic testing to determine if Buckhalter was the father. The test purported to exclude him as the father. The record, however, fails to show how Buckhalter's DNA sample was taken, and no fingerprint or photographic evidence authenticated that the DNA sample tested was Buckhalter's.

Despite the test results, Brown still believed that Buckhalter was A.E.'s father because, according to her, no one else could have been the father. She testified that Buckhalter continued to acknowledge that A.E. is his child after the test results. Brown testified that she and Buckhalter agree that A.E. looks like Buckhalter. Buckhalter has sent A.E. gifts, including shoes, clothes, and Philadelphia Eagles merchandise; he regularly speaks to him on the telephone; and he has offered to pay child support in the past.

## 2. PATERNITY AND CHILD SUPPORT SUIT AGAINST BUCKHALTER

In June 2004, the State filed a complaint against Buckhalter to establish paternity and award child support. The complaint and summons were served at Buckhalter's mother's home in Mississippi on July 15, 2004. On September 9, Buckhalter was personally served with a summons and a copy of the complaint at the Eagles headquarters in Philadelphia, Pennsylvania.

### (a) The District Court Orders Buckhalter to Take a Verified Paternity Test

On December 20, 2004, the State moved to compel Buckhalter to submit to genetic testing. On January 5, 2005, Buckhalter contacted the Lancaster County Attorney's office and told the paralegal that he had taken a private paternity test. The paralegal informed him that he would need to send in the original results with photographs attached to verify that the DNA sample was his. Otherwise, the hearing on the State's motion would take place. Buckhalter did not send the results or any identifying documentation.

The court granted the motion and ordered Buckhalter to submit to genetic testing on January 25, 2005. Buckhalter contacted the county attorney's office to reschedule, and the county attorney's office arranged testing for February 22. Buckhalter apparently arrived late for the appointment, and later called the office to reschedule. The county attorney's office rescheduled the paternity test twice more, but Buckhalter did not show up for either of these rescheduled appointments and did not contact the county attorney's office. On May 25, the State filed an affidavit informing the court that Buckhalter had not submitted to genetic testing as ordered.

### (b) Hearing Before Referee

#### (i) Buckhalter's Addresses

In January 2005, Buckhalter told the paralegal at the county attorney's office to send all mail to the Mississippi address where his mother lived. In February, Buckhalter informed the paralegal that he was then living at an address in New Jersey, but also gave her an address in Texas. The evidence is somewhat contradictory regarding whether he was then moving to Texas or whether, at that time, he was just going to be in Texas for a few days.

#### (ii) Notice and Hearing

On September 2, 2005, the State notified Buckhalter that a hearing would be held on September 13 to determine paternity and child support. The notice was delivered by regular U.S. mail to Buckhalter's Mississippi, Pennsylvania, and New Jersey addresses. Buckhalter contacted the county attorney's office to inform them he could not attend that day because he had to play in a football game. The hearing was continued to October 25; notice of the new hearing date was mailed to Buckhalter's New Jersey address.

Buckhalter did not attend the hearing, nor did he contact the county attorney's office again before the October 25, 2005, hearing. Neb. Rev. Stat. § 43-1412(2) (Reissue 2004) permits a default judgment of paternity upon a showing of service and failure of the defendant to answer or otherwise appear. The referee found that Buckhalter is A.E.'s father by default under § 43-1412(2).

### (iii) Child Support Calculation

At the hearing, the State produced employment verification forms submitted by the Philadelphia Eagles showing Buckhalter's salary. The evidence showed that Buckhalter earned $1,075,000 annually; the referee concluded that Buckhalter's gross monthly income was $89,583.33. However, she did not have evidence of any deductions to which he would be entitled in calculating child support, so she used Buckhalter's gross income in the calculation. Brown testified that she was unemployed so that she could stay at home to care for another child of hers who was ill. She had previously received Medicaid, but stopped receiving payments in anticipation of receiving child support from Buckhalter.

Evidence revealed that A.E. has special financial needs. Brown testified that A.E. is autistic and has been diagnosed with "ADHD." His medication alone costs $300 per month. He has received counseling through a psychiatrist, participated in a thera- peutic program called "Karate Kicks," and attended a specialized daycare center to address his needs. He no longer participates in these services, however, because of the cost.

Because the Nebraska Child Support Guidelines do not set out support amounts for income levels over $10,000 per month, the referee extrapolated from the child support chart to calculate an appropriate support level. She recommended that the court award child support of $4,035 per month. She further recommended retroactive child support from July 2004—the date the complaint was served on Buckhalter—for a total of 17 months. The referee sent a copy of her findings to Buckhalter on December 2, 2005, at his addresses in Pennsylvania, New Jersey, and Texas.

### (c) Buckhalter Gets Involved

On December 12, 2005, Buckhalter moved to dismiss and vacate the referee's report and filed exceptions to the referee's report and notice of appeal and hearing. On March 1, 2006, he moved to compel discovery of the private genetic test results and to continue the hearing. The court, however, denied all of his motions and overruled the exceptions. The court found that Buckhalter is A.E.'s father and ordered child support consistent with the referee's recommendations.

## II. ASSIGNMENTS OF ERROR

Buckhalter assigns that the district court erred in (1) adopting and refusing to vacate the default judgment of paternity, (2) denying his motion to compel discovery of genetic testing evidence in the State's possession, (3) violating his due process rights, and (4) approving the referee's child support calculation.

## III. STANDARD OF REVIEW

■ We review a ruling on a motion to vacate for abuse of discretion.[1]

■ We review child support cases de novo on the record and will affirm the trial court's decision in the absence of an abuse of discretion.[2]

## IV. ANALYSIS

### 1. DUE PROCESS

(a) Failure to Provide Notice of Evidentiary Hearing

Buckhalter alleges that the State failed to provide notice of the evidentiary hearing to establish paternity and award child support. He contends that Neb. Rev. Stat. § 25-534 (Reissue 1995) required the State to serve him with notice of the property hearing at his "last-known address." He argues that his last known address was in Texas. The State, however, contends that because Buckhalter did not answer or otherwise enter an appearance, he was not entitled to receive notice of the hearing. And alternatively, the State contends that notice was properly sent to Buckhalter's New Jersey address.

■ We have consistently held that a party who is served with summons and a copy of the complaint and fails to answer or make an appearance in a case is not entitled to further notice of a hearing. In *Tejral v. Tejral*,[3] the district court entered a default judgment dissolving the parties' marriage. The wife had been personally served with summons and a copy of the petition, but did not answer or appear. After the district court entered the

---

[1] *Destiny 98 TD v. Miodowski*, 269 Neb. 427, 693 N.W.2d 278 (2005).

[2] See *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

[3] *Tejral v. Tejral*, 220 Neb. 264, 369 N.W.2d 359 (1985).

default judgment, she moved to vacate, arguing that she had not received notice of the dissolution hearing. We held that

> where a party in a dissolution of marriage case is served personally with a summons and a copy of the petition in the case, and that party chooses not to file any pleading nor to enter an appearance in the case, and has not otherwise requested notice of hearing, notice of a default hearing need not be given to such party.[4]

We reasoned that to accept her position "would mean that service is required twice in every case before a default judgment could be entered. A party's voluntary inaction and inattention should not be permitted to paralyze the ordinary and orderly functioning of the legal process."[5]

We applied the *Tejral* holding to a paternity and child support suit in *Starr v. King.*[6] There, the plaintiff personally served the defendant with summons and a copy of the petition. He did not answer or appear. Notice of the hearing was delivered to an address where the defendant claimed he had never lived, and he argued that he did not receive notice. But we held that notice of the hearing was not required under the rule in *Tejral.*

Buckhalter attempts to distinguish this case by arguing that § 25-534 required notice of the hearing. Section 25-534 designates how service should be made in any action or proceeding. That section provides: "Whenever in any action or proceeding, any . . . notice, or other document, except a summons, is required by statute or rule of the Supreme Court" to be served on a party represented by an attorney, service may generally be made upon the attorney. It also requires that for parties "*appearing* in an action without an attorney," service by mail must be to the address designated on the record or to a party's "last-known address."

Section 25-534 does not apply to Buckhalter because he did not appear until after the hearing had taken place. Here, Buckhalter was personally served with summons and a copy of

---

[4] *Id.* at 267, 369 N.W.2d at 361. Accord *Joyce v. Joyce*, 229 Neb. 831, 429 N.W.2d 355 (1988).

[5] *Tejral v. Tejral, supra* note 3, 220 Neb. at 267, 369 N.W.2d at 361.

[6] *Starr v. King*, 234 Neb. 339, 451 N.W.2d 82 (1990).

the complaint. Despite multiple contacts with both Brown and the Lancaster County Attorney's office, he failed to answer or appear. Buckhalter was aware that a case was proceeding against him, and in fact, on September 2, 2005, he received actual notice of the original September 13 hearing date. Yet, he failed to involve himself for 17 months. We conclude that he was not entitled to notice of the hearing.

(b) Failure to Disclose Paternity Test

Buckhalter contends that the State violated his due process rights by failing to present documentary evidence of the genetic test. He argues that it was "contrary to notions of due process, which embody the principle of fundamental fairness,"[7] not to present genetic testing evidence. The State, however, argues that it did disclose the existence of the paternity test exculpating Buckhalter through testimony. But the test itself was not admitted because it lacked foundation.[8]

Buckhalter cites *In re Interest of Kelley D. & Heather D.*[9] for the proposition that "[t]he concept of due process embodies the notion of fundamental fairness and defies precise definition." And due process is a flexible notion that calls for such procedural protections as the particular situation demands.[10] Yet, the only argument Buckhalter makes is the bare assertion that the State's failure to present relevant, exculpatory evidence was unfair. But failure to introduce his genetic test—whose authenticity could not be verified—does not violate a principle of fundamental fairness.

2. DEFAULT JUDGMENT AND MOTION TO VACATE

Buckhalter contends that the district court should have vacated the referee's report concluding that Buckhalter is A.E.'s father. Buckhalter argues that the court should have vacated the default finding of paternity because he has a meritorious defense.

---

[7] Reply brief for appellant at 7.

[8] See *State on behalf of Joseph F. v. Rial*, 251 Neb. 1, 554 N.W.2d 769 (1996).

[9] *In re Interest of Kelley D. & Heather D.*, 256 Neb. 465, 476, 590 N.W.2d 392, 401 (1999).

[10] *Id.*

Buckhalter's alleged meritorious defense is that the private paternity test results excluded him as the child's father. The State argues alternatively that (1) the private, unsubstantiated genetic test results do not provide a meritorious defense to paternity, or (2) the court's decision should be upheld on the evidence.

Section 43-1412(2) provides for a default judgment to be entered in a paternity action upon a showing of service and failure of the defendant to answer or otherwise appear. But when the court has entered a default judgment and the defendant has made a prompt application at the same term to set it aside, with the tender of an answer or other proof disclosing a meritorious defense, the court should on reasonable terms sustain the motion and permit the cause to be heard on the merits.[11] A meritorious or substantial defense or cause means one which is worthy of judicial inquiry because it raises a question of law deserving some investigation and discussion or a real controversy as to the essential facts.[12] To vacate the default judgment, Buckhalter is not required to show that he will ultimately prevail, but only that he has a recognized defense that is not frivolous.[13]

The State contends that the private paternity test excluding Buckhalter as A.E.'s father is not a meritorious defense. They assert that Buckhalter's defense is simply to deny paternity. And if we allowed such a defense to vacate the default judgment, defendants in paternity cases would always have the incentive to wait until after the hearing is over before appearing in the case.

Two of the leading cases in which we recognized a meritorious defense are *Miller v. Steichen*[14] and *Beren Corp. v. Spader.*[15] *Miller* involved a garnishment proceeding against a liability insurance provider. The summons and garnishment order were served on the ex-president of the insurance company, and the

---

[11] See *Miller v. Steichen*, 268 Neb. 328, 682 N.W.2d 702 (2004). See, also, *Steinberg v. Stahlnecker*, 200 Neb. 466, 263 N.W.2d 861 (1978); *Beren Corp. v. Spader*, 198 Neb. 677, 255 N.W.2d 247 (1977).

[12] *Miller v. Steichen, supra* note 11.

[13] See *id.*

[14] *Id.*

[15] *Beren Corp. v. Spader, supra* note 11.

company did not appear. After the trial court entered a default judgment against the insurance company, the company moved to vacate the judgment. It asserted that its policy did not cover the acts upon which the suit was based. It presented a federal district court decision, in which the federal court had previously found that claims such as the plaintiff's were not covered by the insurer's policy. We held that the insurer had sufficiently demonstrated a defense " " " "worthy of judicial inquiry." ' " [16]

In *Beren Corp.*, we addressed whether the trial court should have vacated a default judgment in an action to quiet title to real estate in the plaintiff. The defendants moved to vacate the order and presented a proposed answer in which they alleged that the relevant documents showed they had an interest in the real estate. The issue they raised was primarily one of law—that under the facts alleged by the plaintiff, they owned an interest. After a detailed analysis of the law in the area, we concluded the defendants had raised a question deserving investigation. [17]

Here, we must decide whether the unsubstantiated paternity test results create a " " " "real controversy . . . worthy of judicial inquiry." ' " [18] In addressing this issue, it is useful to consider when genetic tests may be admitted as evidence of paternity. In *State on behalf of Joseph F. v. Rial*, [19] we addressed whether paternity test results were properly admitted as evidence. There, the testimony revealed in detail the procedures used and the chain of custody involved in handling the paternity test. We concluded that "[t]he procedures for the collection, transportation, and examination of the blood were reliable so as to allow the trial court to find that the test results were what the State claimed, results of parentage tests performed on blood samples drawn from [the parties involved]." [20] Although *Rial* did not address the same issue, it does demonstrate that evidence is needed to confirm the reliability of genetic tests if they are to be used as evidence.

---

[16] *Miller v. Steichen, supra* note 11, 268 Neb. at 335, 682 N.W.2d at 708.

[17] *Beren Corp. v. Spader, supra* note 11.

[18] See *Miller v. Steichen, supra* note 11, 268 Neb. at 335, 682 N.W.2d at 708.

[19] *State on behalf of Joseph F. v. Rial, supra* note 8.

[20] *Id.* at 11, 554 N.W.2d at 776.

Here, the private paternity test was unsubstantiated, and Buckhalter has offered nothing to suggest that the test results are reliable. Buckhalter argues that this evidence creates a "genuine factual controversy." He cites the Nebraska Court of Appeals' decision in *Quintela v. Quintela*[21] for the rule that medical evidence of nonpaternity convincingly rebuts the presumption of paternity arising from marriage. But in *Quintela*, the validity and reliability of the testing was not at issue.

The existence of Buckhalter's unverified test results does not create a meritorious defense that would require the district court to vacate the referee's findings. Without verification, we cannot determine whether the test results are what Buckhalter claims, and thus, they do not create a "real controversy." Further, Buckhalter's defense does not create any dispute that was not already known. Brown's testimony established that the paternity test exists, so the referee was aware of the test results at the evidentiary hearing. And the State attempted for several months to obtain reliable genetic test results after warning Buckhalter that the private paternity test was insufficient. By failing to take the genetic testing ordered by the court, Buckhalter passed up the opportunity to present a meritorious defense.

Although he does not need to prove that he would ultimately prevail, under these facts, Buckhalter has failed to show a meritorious defense. The trial court did not err in denying Buckhalter's motion to vacate.

### 3. CHILD SUPPORT AWARD

Buckhalter argues that the court erred in approving the referee's child support recommendation. He alleges that the evidence of his income—employment verification forms submitted by the Philadelphia Eagles—was insufficient because tax returns, financial statements, and wage stubs should be used. He also contends that the referee improperly used his gross income instead of net income. Buckhalter argues that the State had the burden to present the appropriate evidence of his income and deductions.

---

[21] *Quintela v. Quintela*, 4 Neb. App. 396, 544 N.W.2d 111 (1996).

 In general, child support payments should be set according to the Nebraska Child Support Guidelines.[22] The guidelines provide that in calculating child support, the court must consider the total monthly income, defined as the income of both parties derived from all sources, except all means-tested public assistance benefits and payments received for children of prior marriages.[23]

 The guidelines are applied as a rebuttable presumption, and all orders for child support shall be established under the provisions of the guidelines unless the court finds that one or both parties have produced sufficient evidence to rebut the presumption.[24] A court may deviate from the guidelines whenever the application of the guidelines in an individual case would be unjust or inappropriate.[25]

(a) Use of Employment Verification
Forms Instead of Tax Returns

Buckhalter argues that the employment verification forms the State introduced to show Buckhalter's income were inadequate. Paragraph D of the Nebraska Child Support Guidelines provide, "[c]opies of at least 2 years' tax returns, financial statements, and current wage stubs should be furnished to the court and the other party to the action at least 3 days before any hearing requesting relief." Buckhalter contends that the State should have requested his tax returns through discovery instead of relying on the employment verification forms as evidence of his income.

Buckhalter, however, was in the best position to provide more "thorough" evidence of his income. Yet, he chose not to participate. He now suggests that the State should have used discovery to gain information about his income. We believe the State used a reasonable method to obtain information about Buckhalter's

---

[22] See, Neb. Rev. Stat. § 42-364.16 (Reissue 2004); *Gangwish v. Gangwish, supra* note 2.

[23] *Gangwish v. Gangwish, supra* note 2; *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004); *Rhoades v. Rhoades*, 258 Neb. 721, 605 N.W.2d 454 (2000).

[24] See *Faaborg v. Faaborg*, 254 Neb. 501, 576 N.W.2d 826 (1998).

[25] *Rhoades v. Rhoades, supra* note 23; *Faaborg v. Faaborg, supra* note 24.

income when he refused to participate in the proceedings or submit evidence in his own behalf. The court did not err in calculating its child support award on employment verification forms instead of tax returns or wage stubs.

### (b) Use of Gross Income Instead of Net Income

Buckhalter contends that the court erred in calculating his child support obligation using his gross monthly income. He argues that because the court did not include any deductions, the calculation is "grossly incorrect and inequitable."[26]

Paragraph E of the Nebraska Child Support Guidelines provides for deductions from a party's monthly income for federal and state income taxes, FICA, health insurance, retirement contributions, and child support and other obligations to other children. These items are annualized to arrive at "monthly net income." Monthly support amounts are then determined by plugging the combined monthly net income of both parties into table 1 of the guidelines to establish the appropriate support level.

Table 1, however, does not provide for support amounts when combined net monthly income exceeds $10,000. Paragraph C(3) provides that when total net income exceeds $10,000, child support "may be more but shall not be less than the amount which would be computed using the $10,000 monthly income unless other permissible deviations exist." We have previously held that "total monthly child support calculations which exceed the combined net monthly income provided for in the guidelines should be left to the discretion of the trial court and affirmed absent an abuse of discretion."[27]

Although the referee did not consider any deductions which Buckhalter may have been allowed for taxes, the court did not abuse its discretion in adopting her child support recommendation. Contrary to Buckhalter's assertion, the referee's calculations were far from arbitrary. She engaged in a detailed extrapolation of the child support guidelines, in which she determined a pattern of increases for every $1,000 increase in income starting at $7,000 per month. She extended that pattern until she reached

---

[26] Brief for appellant at 30.

[27] *Faaborg v. Faaborg, supra* note 24, 254 Neb. at 506, 576 N.W.2d at 830.

a monthly income of $89,000. Further; she provided a table which shows her calculations.

Buckhalter proposes that the referee should have reduced Buckhalter's income by one-third to one-half to allow for deductions he could have received. But the referee's table reveals that even with such deductions, the child support award would change very little. Deducting one-third of Buckhalter's income for a net monthly income of $59,000 would yield a support amount of $3,975—a difference of only $60 or about 1.4 percent. Even allowing for deductions worth half Buckhalter's income would yield a support amount of $3,929—a difference of $106 or about 2.5 percent. Thus, $4,035 was not grossly incorrect or inequitable. The referee acted well within her discretion in recommending $4,035. The trial court did not err in adopting the child support recommendation.

## V. CONCLUSION

Because of his failure to answer or appear in this case for 17 months, Buckhalter was not entitled to receive notice of the evidentiary hearing. Thus, his due process rights were not violated. The State's failure to introduce the unsubstantiated private paternity test results also did not violate his due process rights. The trial court did not err in denying Buckhalter's motion to vacate because he does not have a meritorious defense.

Finally, the court did not abuse its discretion in ordering Buckhalter to pay monthly child support of $4,035 based on the evidence at the hearing. We affirm the district court's decision.

AFFIRMED.