IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

BRITTANY L. KELLY, APPELLANT,
V.
CHRISTOPHER W. SMITH, APPELLEE.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KELLY V. SMITH

Filed June 24, 2014.    No. A-13-482.

Appeal from the District Court for Sarpy County: WILLIAM B. ZASTERA, Judge. Affirmed in part, and in part reversed and remanded with directions.

Christopher A. Vacanti and Charles L. Grimes, of Vacanti Shattuck, for appellant.

No appearance for appellee.

INBODY, Chief Judge, and IRWIN and BISHOP, Judges.

BISHOP, Judge.

Brittany L. Kelly (Brittany) appeals from the decree of paternity entered by the Sarpy County District Court. The decree established Christopher W. Smith as the father of their minor child, Michael Smith, born in Nebraska in January 2011. The trial court awarded the parties joint legal custody, awarded Christopher 2 months of extended parenting time in Virginia, ordered Christopher to pay child support at a downward deviation from the Nebraska Child Support Guidelines, and did not award child support and childcare costs retroactive to the date of Michael's birth. Brittany appeals, arguing such determinations were an abuse of discretion. We affirm the court's award of joint legal custody and child support, but reverse and remand with directions the court's determination regarding extended parenting time, and reverse and remand for further proceedings the court's determinations regarding retroactive child support and childcare costs.

BACKGROUND

Brittany, a Nebraska resident, and Christopher, a Virginia resident, engaged in a long-distance romantic relationship for 4 years. The parties ended their relationship the April

- 1 -

following Michael's birth. Michael has resided with Brittany in Nebraska from birth. Brittany filed a complaint to establish paternity, custody, and support on August 1, 2011.

Brittany and Christopher participated in mediation in February 2012 and developed a parenting plan. Christopher initially agreed to the mediated parenting plan, but at some point that is not clear from our record, he had a change of heart regarding legal custody and parenting time. Trial was held on January 11, 2013, to resolve disputed issues of custody, parenting time, child support, and childcare costs. The parties stipulated to paternity on the record.

Brittany testified that when Michael was born, she was attending nursing school. While in school, she taught dance lessons part time, but quit after having Michael. Brittany graduated from nursing school in May 2012 and began working as a registered nurse in October 2012. At the time of trial, Brittany was earning approximately $3,241.68 per month.

Christopher, age 25 at the time of trial (Brittany's age was not apparent in our record), has been employed as a police officer with the city of Hampton, Virginia, since 2008. At the time of trial, Christopher typically worked an evening shift (4 p.m. to 12:30 a.m.). A December 28, 2012, pay stub received into evidence reflects that Christopher's base salary was $40,863 and that his regular pay for a 2-week period was based on 80 hours of work. Christopher explained that his base salary has not changed in 6 years, but that his income is variable because he can and does earn more for overtime, court time, and extra duty. His 2011 W-2 form reflects his wages for that year were $44,083.32, and his gross pay in 2012 was $49,238.03, according to the 2012 pay stub. Christopher provides medical coverage for Michael through his employer.

Christopher testified he was in the process of making a career change to the fire department. Shortly before trial, the chief of the Hampton Fire Department called him to schedule "panel interviews," which Christopher said meant that "more likely than not" he will be switching to the fire department. A work schedule at the fire department would consist of 9½ 24-hour shifts per month, and his base pay would remain the same.

At the time of trial, Christopher had seen Michael (then 2 years old) in person on three different occasions. Christopher was present in Nebraska for 5 weeks when Michael was born in January 2011. A few months later, Brittany took Michael to Virginia for 4 weeks from June to July. Although Christopher spent time with Michael during the first 2 weeks of Brittany and Michael's visit, Christopher admittedly did not see Michael at all for the next 2 weeks because he was busy with work, he had just moved out of his parents' house, he had started a new relationship, and "regrettably let my obligations . . . as a father fall to the wayside for those two weeks." Nearly a year later, in March 2012, Brittany's parents paid for Christopher to visit Michael in Nebraska. The record does not disclose the length of that visit. Christopher returned to Nebraska one time since March 2012 (for trial in the present case), but did not schedule time to see Michael due to his lack of annual and sick leave. At the time of trial on January 11, 2013, Christopher had not seen Michael in person since March 2012.

Christopher and Brittany use "Skype" so that Christopher can see and communicate with Michael using the Internet. Brittany compiled all of the Skype logs between Christopher and her from January 2011 to the date of trial, which reflect that Christopher generally would use Skype once or twice a month, between 10 minutes to about 1 hour each time. Brittany's logs reflect several months where Christopher had no Skype communication with Michael at all, including a 4-month period between June and October 2012. Christopher explained that this gap was because

he had transferred to a midnight shift, which was very difficult on him, and he spent his free time sleeping or trying to recuperate. However, Christopher was taken off the midnight shift in July 2012, and the evidence reflects only two subsequent Skype communications--one in October and the other on Michael's birthday in January 2013.

Christopher testified his Skype schedule was limited because he had been working as much extra duty as possible. Additionally, he did not have an Internet connection at his house, and his only reliable Internet connection was at his parents' house, which was 1 hour away. Christopher said that those factors, combined with his sleep schedule, trying to keep himself fed, and making sure he had a uniform and serviceable weapon, caused him to "just [run] out of time many, many days."

Christopher testified he did not use the telephone to communicate with Michael because Christopher did not like it. Brittany testified that she and Christopher have "businesslike" conversations on the telephone about child support, but Christopher does not often inquire about how Michael is doing.

Christopher felt that he should have joint legal custody. He noted that while it would be more convenient for Brittany to have sole legal custody, he wanted to be consulted on nonemergency issues. Christopher had no doubt he could work with Brittany for Michael's best interests, and he pointed out that they have been communicating in the last 2 years about Michael, including agreeing to raise him in the Catholic faith. Brittany was opposed to joint legal custody because Christopher cannot be in Nebraska physically, so his knowledge of how to base his decisions comes from her, and it would be easier if she could decide on her own.

At trial, Christopher testified he would like 3 months of consecutive extended parenting time in Virginia. He said that his mother could babysit Michael at her house, because he "hopefully" will be in the fire academy, and if he is, he will have day-shift hours so he could pick up Michael from his mother's house in the evening. Christopher testified that his mother's physical health "isn't the best lately" and that she is no longer able to work outside the home. Christopher does not believe it would affect her ability to attend to Michael, but he did admit that "the doctors don't know what's gone on with her" and she has "good days and bad days."

Christopher submitted his proposed parenting plan to the court. According to his proposed parenting plan, the parties would share joint legal custody, Christopher would have 4 hours of Skype visitation per month, and he could exercise visitation in Nebraska with advanced notice. Christopher's proposed parenting plan also included a provision for "Extended Parenting Time," stating that Christopher "may have extended parenting time with his minor child for a period of three (3) months each year beginning in 2013."

Brittany submitted the parties' mediated parenting plan to the court and requested that the court adopt it. Pursuant to the parties' mediated parenting plan, Brittany would have sole legal and primary physical custody of Michael, subject to 4 hours of Skype visitation with Christopher per month. The parties agreed that Christopher could travel to Nebraska with advanced notice to spend parenting time with Michael in Brittany's home. The parties agreed that Christopher would have no overnight visitation at the present time and that visitation outside of Michael's home would have Brittany in attendance. Due to Michael's age, all holidays and vacation time would be classified as regular parenting time, which the parties agreed to remediate in the year

2014. The parties also agreed to remediate regular parenting time, including summer parenting time, between January and April 2014.

No temporary order appears in our record, but Christopher voluntarily paid child support to Brittany beginning in February 2011. Brittany testified Christopher paid her anywhere from $0 to $600 per month through November 2012, although Christopher testified he also sent checks for December 2012 and January 2013. Christopher testified he initially gave Brittany $300 because he "had no idea of the costs that would be required to raise a child and how much he needed to be properly supported," and subsequently began paying her $600 per month. Christopher said that because he had some unforeseen bills and expenses and an ankle injury which prevented him from finding a "good amount" of extra duty, he began paying Brittany less and less frequently because he "had to wait for there to be money in the bank in order to send her a check." Christopher testified he thought his voluntary payments to Brittany included money toward daycare. At the time of trial, Christopher had paid Brittany a total of $11,300.

Brittany sought additional child support retroactive to February 1, 2011. Brittany prepared two child support worksheets pursuant to the guidelines that were received into evidence as aids to the court. Brittany's worksheets reflect that Christopher should have paid child support in the total amount of $16,212 between February 1, 2011, and January 1, 2013. Brittany also requested that Christopher reimburse her $2,527.74 for his proportionate share (54 percent) of the daycare costs she incurred while she was in nursing school. Brittany asked the court to enter a judgment against Christopher in the amount of $7,439.74 for retroactive child support and childcare, after providing him with credit for $11,300, the amount he voluntarily paid.

After both parties rested, the court indicated to the parties on the record that its decisions would "somewhat" depend on whether Christopher moves to the fire department. The parties agreed to leave the record open until February 28, 2013, for them to submit evidence as to whether Christopher's transfer to the fire department would occur. Our record does not reflect that the parties submitted any additional evidence.

On April 8, 2013, the court entered a decree of paternity. The court found that it was in Michael's best interests for the parties to have joint legal custody, provided that if the parties cannot agree on an issue, Brittany has the final say, subject to the court's review. The court awarded Brittany primary physical custody, subject to Christopher's parenting time provided in the court-modified parenting plan attached to the decree.

The court's parenting plan attached to the decree generally contains the same language as the parties' mediated parenting plan, with some revisions. Relevant to this appeal, the court inserted an edited page from Christopher's proposed parenting plan, which contains a provision for "Extended Parenting Time." According to the court's modified plan, Christopher "may have extended parenting time with Michael for a period of two (2) months each year beginning in 2014." The parenting plan also provides Christopher with 8 hours of Skype visitation per month. The decree provides that Christopher is responsible for all transportation costs associated with his parenting time. The court also struck out the provisions in the mediated parenting plan regarding remediation, as well as the provision that vacation time was to be classified as regular parenting time.

The court attached a child support worksheet to the decree (identical to the 2012 worksheet prepared by Brittany), reflecting that Christopher's child support obligation would be $588 per month pursuant to the guidelines. However, the court found that because Christopher will need to travel for purposes of visitation, a downward deviation was necessary. The court therefore ordered Christopher to pay $450 per month commencing April 1, 2013. The court also provided Christopher with an abatement of one-half his child support obligation during the exercise of his 60 days of visitation. Work-related childcare expenses were divided between the parties such that Brittany was responsible for 46 percent and Christopher 54 percent. The court did not make specific findings regarding retroactive child support or childcare costs.

Brittany filed a motion to alter or amend on April 16, 2013, requesting that the court reconsider adopting the parties' mediated parenting plan. Brittany requested that the court require Christopher to travel to Nebraska on a regular basis first to become familiar with Michael before Christopher can exercise extended parenting time in Virginia and that the court reasonably divide transportation costs between the parties rather than providing Christopher with a downward deviation in child support because Christopher has never exercised regular parenting time. Brittany also requested that the court reconsider awarding retroactive child support and childcare costs. The court denied Brittany's motion to alter or amend on May 3, 2013, and Brittany timely appealed.

ASSIGNMENTS OF ERROR

Brittany claims the trial court erred in (1) its award of joint legal custody, (2) its award of extended parenting time to Christopher, (3) its award of child support, and (4) its failure to award retroactive child support and childcare costs.

STANDARD OF REVIEW

Child custody determinations, and parenting time determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Hill v. Hill*, 20 Neb. App. 528, 827 N.W.2d 304 (2013).

An appellate court reviews child support cases de novo on the record and will affirm the trial court's decision in the absence of an abuse of discretion. *State on behalf of A.E. v. Buckhalter*, 273 Neb. 443, 730 N.W.2d 340 (2007). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.*

ANALYSIS

*Joint Legal Custody.*

In Christopher's answer, he requested joint legal custody, but following mediation, the parties agreed that Brittany would have sole legal custody. At trial, however, Christopher testified that he had changed his mind after reviewing the plan further and felt he should have

joint legal custody. The trial court determined that it was in Michael's best interests for the parties to have joint legal custody, which Brittany argues was an abuse of discretion.

The Parenting Act defines "[j]oint legal custody" as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Cum. Supp. 2012). The Parenting Act mandates that a parenting plan "shall serve the best interests of the child," Neb. Rev. Stat. § 43-2929(1) (Cum. Supp. 2012), and the best interests of the child requires that the court "determine whether it is in the best interests of the child for parents to maintain continued communications with each other and to make joint decisions in performing parenting functions as are necessary for the care and healthy development of the child." Neb. Rev. Stat. § 43-2923(4) (Cum. Supp. 2012). Communication is an essential requirement for joint custody to be successful. *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009). See, also, *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (trial court's decision that joint legal custody was not in child's best interests because parents were unable to communicate face-to-face and distrusted one another was consistent with statutory language requiring court to determine whether it is in best interests of child for parents to maintain continued communication).

The evidence at trial reflects that Christopher and Brittany communicate well with one another regarding Michael's welfare. Brittany testified that she and Christopher have "businesslike" conversations on the telephone and that she always consults Christopher and tells him when she needs or wants to change something about Michael's care. Christopher testified he has been communicating with Brittany for the past 2 years about Michael and has "no doubt" he could work with Brittany for Michael's best interests. The parties were able to agree together that Michael should be raised in the Catholic faith. Brittany opposes joint legal custody, not because she has concerns she and Christopher will not be able to make joint decisions, but, rather, because it would be easier for her to make an executive decision, since Christopher cannot be physically present in Nebraska. Brittany testified that all of Christopher's knowledge about school systems, Michael's pediatrician, and daycare providers comes from her and that she believes Christopher will not always have the time to "have a two-hour conversation about what the pediatrician thinks." While it may be more convenient for Brittany to have sole legal custody, we cannot say that the trial court abused its discretion in awarding joint legal custody, given the parties' previously demonstrated abilities to communicate and agree on fundamental decisions regarding Michael's welfare. Parents who are able to reasonably communicate and decide such matters related to their child are to be applauded and encouraged to maintain that level of communication and cooperation throughout the raising of their minor child. So while it may take more effort for these parents to engage each other in this manner, the joint involvement should result in a healthier, happier environment for Michael. And while Brittany has the final say in the event of impasse, the record suggests that it should be the rare instance when this final authority would need to be asserted. Again, this speaks well of both parents. We therefore affirm the district court's decision to award the parties joint legal custody of Michael.

*Award of Extended Parenting Time.*

Brittany contends that the trial court abused its discretion by awarding Christopher 2 months of extended parenting time with Michael in Virginia beginning in 2014. We agree that on

the record before us, it is not in Michael's best interests at this time to spend 2 months in Virginia with Christopher, who "by his own choice, is a virtual stranger to his son." Brief for appellant at 17. Although the parenting plan does not indicate that these 2 months shall be exercised as 60 consecutive days, it could arguably be read to allow that, especially since it does provide that once Michael starts school, the extended parenting time shall take place from shortly after the conclusion of the school year until 1 week prior to the commencement of the next school year. Further, Christopher testified that he "would like just three consecutive months with [Michael]," and the extended parenting time provision used (as modified) by the trial court was drafted by Christopher. We also note that the trial court provided for a one-half abatement of child support when Michael exercises the 60 days, which indicates an intent that this parenting time is to be exercised in lengthier increments to support such an abatement or adjustment under the guidelines.

Notable in our de novo review is that the trial court's parenting plan provided for no overnight parenting time for Christopher with Michael apparently until the commencement of the 2 months of extended parenting time in Virginia in 2014, nor did it require any minimum amount of time be spent between Christopher and Michael in Nebraska until such extended parenting time would commence. The "regular parenting time" provided in the court's parenting plan required that Brittany be present for any parenting time exercised by Christopher, presumably until 2014 when the extended parenting time in Virginia would commence. Accordingly, Christopher would not have an opportunity to exercise independent parenting time with Michael in Nebraska to facilitate the development of a relationship with his son without Brittany present, nor would he have an opportunity to try overnight parenting before taking Michael away on extended stays in Virginia. The evidence established that Christopher had not exercised parenting time with Michael since March 2012, nor did he attempt to have parenting time when he was in Nebraska for trial in February 2013. Therefore, there had been no physical contact between Christopher and Michael for almost 1 year, yet there was no provision in the trial court's parenting plan to address this lack of contact between father and son. The development of a relationship with his father would be important to Michael's sense of security in traveling away from his mother, his primary custodial parent, for any extended period of time. As discussed further below, we conclude that the trial court abused its discretion by not incorporating a transitional or graduated parenting plan before awarding 2 months of parenting time to Michael, which arguably could be taken in 60 consecutive days in Virginia.

In determining custody and parenting arrangements under the Parenting Act, the court shall consider the best interests of the minor child, including in relevant part:

> (1) A parenting arrangement and parenting plan . . . which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children;
> . . . .
> (3) That the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child;
> . . . .

. . . and

(6) . . . .

    (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

    . . . .

    (c) The general health, welfare, and social behavior of the minor child.

§ 43-2923. In the development of a parenting plan, consideration shall be given to the child's age, the child's developmental needs, and the child's perspective, as well as consideration of enhancing healthy relationships between the child and each party. § 43-2929(5).

In considering the factors above, particularly Michael's age (age 2 at the time of trial) and the lack of relationship between Christopher and Michael at this time as established in the record before us, we conclude that it is not in Michael's best interests for Christopher to exercise up to 60 consecutive days of parenting time in Virginia without first incorporating a transitional or graduated parenting schedule. The record reflects that Christopher has only physically seen Michael on three different occasions during Michael's life, with the last visit occurring in March 2012 when Michael was just over 1 year old. Even with such few opportunities to spend time with Michael, Christopher still prioritized other aspects of his life before his son. For example, when Brittany took Michael to visit Christopher in Virginia for 4 weeks, Christopher admittedly did not see Michael at all for 2 of the 4 weeks, explaining, "In one fell swoop, I had a son, moved out of my parents' house, and engaged in another relationship, and I was just trying to balance both my life and everything in Virginia with seeing my son." Christopher recognized he "let my obligations . . . as a father fall to the wayside for those two weeks."

Christopher's travel schedule to Nebraska to spend time with Michael falls quite a bit short when compared with his travel schedule to Nebraska when he and Brittany were dating. For dating purposes, Christopher traveled to Nebraska every 12 weeks. Subsequent to Michael's birth, Christopher has only returned to Nebraska to see Michael on one other occasion in March 2012. Additionally, although he also returned to Nebraska for trial in January 2013, and despite knowing about the date of trial for several months, Christopher purchased his plane ticket the same day he left Virginia, with a scheduled return the day after trial--this left him with no time to see Michael. Christopher's employment and income were not factors in the reduced travel to Nebraska, since neither have changed since Michael's birth; rather, "the only reasonable explanation" he had for not maintaining his previous every-12-week travel schedule was that he was "trying to maintain a home" and the police department was short-manned so "leave was getting denied." There is no evidence that Brittany has interfered with Christopher's parenting time. Instead, Brittany testified that she is "disappointed" Christopher has not come to Nebraska to see Michael more than once since his birth. Brittany testified she would welcome Christopher "any time" if he wanted to come to Nebraska more frequently.

Besides physical parenting time, the parties use Skype so that Christopher can see and interact with Michael using the Internet. Although Christopher could exercise up to 4 hours of Skype under the mediated parenting plan, and up to 8 hours under the court's parenting plan, he has never exercised more than 2 hours in any given month, with as many as 4 months between Skype sessions. Christopher explained his Skype schedule has been limited because he has been working as much extra duty as possible, and the house he moved into does not have Internet

service providers in the area. Christopher testified that those factors combined with his sleep schedule, trying to keep himself fed, and making sure he had a uniform and serviceable weapon, caused him to "just [run] out of time many, many days." Christopher also does not use the telephone to communicate with Michael. Again, there is no evidence that Brittany has interfered with Christopher's Skype visitation or telephone communication, testifying she would let Christopher Skype with Michael every day if he wanted, and has asked Christopher many times to call.

The record does not reflect that Christopher has ever taken care of Michael alone on an overnight basis, and his plans for how to care for Michael during his 2 months of extended parenting time hinged on his belief that he would be in the fire academy and his ill mother, who lives an hour away, could babysit Michael. However, it appears from our record that his transfer to the fire department did not occur. Christopher did not testify as to how he could care for Michael for up to 60 consecutive days while employed at his current position as a police officer where he works 4 p.m. to 12:30 a.m., especially given his testimony that he often runs out of time to exercise even Skype visitation with his current work schedule.

We recognize that parenting time determinations are matters initially entrusted to the discretion of the trial court. See *Hill v. Hill*, 20 Neb. App. 528, 827 N.W.2d 304 (2013). However, we agree with Brittany that "[t]o go from zero to 100 as a parent to Michael" is not in Michael's best interests based on the record before us. Brief for appellant at 23. Given Michael's young age and the lack of parenting time previously exercised by Christopher, Brittany's suggestion that the trial court set up a gradual schedule to "make Michael comfortable spending time away from his mother in his father's care; and to ensure that Christopher has the ability to provide the proper parental care to his son" would better serve the objectives of the Parenting Act. To take a now 3-year-old child from his primary parent and out of the only home he has known since birth and send him away from that environment for up to 60 consecutive days with a person, albeit his biological father, with whom the child has had no real opportunity to build a relationship of trust, is not in that child's best interests. Accordingly, we reverse the award in the district court's decree of 2 months of extended parenting time commencing in 2014, and remand the cause with directions for the district court to establish a graduated schedule of increased parenting time for Christopher as set forth herein.

Given that the current parenting plan has not provided for any overnights for Christopher with Michael, the graduated schedule should include at a minimum that Christopher exercise Thursday to Sunday overnight parenting time (or 3 or more other consecutive nights as the parties may otherwise agree) with Michael in Nebraska on at least three different occasions before taking Michael to Virginia for any initial extended parenting time there. Once the Nebraska overnight parenting periods have been successfully exercised, then at least the first two initial extended parenting periods in Virginia shall be for no longer than 1 week at a time unless both parties agree that Michael is adjusting well and are agreeable to extending that parenting time. Each extended parenting period in Virginia thereafter may be increased by up to 1 additional week of parenting time at a time (or more if the parties agree) until reaching the 2 months of extended parenting time as set forth in the trial court's parenting plan.

*Deviation From Child Support Guidelines.*

The child support worksheet attached to the decree reflects that Christopher's child support obligation would be $588 per month pursuant to the Nebraska Child Support Guidelines. The trial court found that "by reason of the need of [Christopher] to travel for purposes of visitation, and the expense thereof, the Court finds a deviation is necessary" and reduced Christopher's monthly obligation from $588 to $450, for a yearly reduction of $1,656.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Pearson v. Pearson*, 285 Neb. 686, 828 N.W.2d 760 (2013). The guidelines "shall be applied as a rebuttable presumption," and "[a]ll orders for child support obligations shall be established in accordance with the provisions of the guidelines unless the court finds that one or both parties have produced sufficient evidence to rebut the presumption that the guidelines should be applied." Neb. Ct. R. § 4-203 (rev. 2011).

Under the guidelines, a deviation in the amount of child support is allowed whenever the application of the guidelines in an individual case would be unjust or inappropriate. *Pearson, supra*. The guidelines specifically address adjustments in child support related to visitation, providing, "Any documented substantial and reasonable long-distance transportation costs directly associated with visitation or parenting time may be considered by the court and, if appropriate, allowed as a deviation from the guidelines." Neb. Ct. R. § 4-210 (rev. 2011). Only reasonable transportation expenses may reduce or abate a child support obligation. *Pearson, supra*. As with other visitation determinations, the matter of travel expenses associated with visitation is initially entrusted to the discretion of the trial court. *Id*. Deviations from the guidelines must take into consideration the best interests of the child or children. *Id*.

Brittany argues that the court abused its discretion in deviating from the guidelines because Christopher did not offer any evidence to document his reasonable travel expenses. However, Christopher did testify that his flight to Nebraska to attend trial--purchased the same day that he departed from Virginia--cost him $989. When asked whether that number was illustrative of what it will cost Christopher to transport his son to and from Nebraska, Christopher replied, "Vaguely." He also asked the court to consider ordering him to pay $400 a month so he could save money for plane tickets, lodging, and a rental car. Although no documents were submitted in support of those actual costs, we find the trial court did not abuse its discretion in considering Christopher's testimony regarding travel costs, even if the cost of a plane ticket purchased the same day may not be reflective of tickets purchased well in advance of actual travel. There is no question that Christopher will have to spend money on travel to exercise parenting time with his son, and the reduction granted by the trial court was reasonable considering travel costs will be incurred by Christopher on multiple occasions through the year. It is in Michael's best interests to have his father engaged in his life, and the trial court's decision to help facilitate that by deviating from the guidelines for travel costs was not an abuse of discretion, especially since there was no evidence to suggest that the reduced child support would adversely impact Michael's best interests.

*Retroactive Child Support and Childcare Costs.*

Brittany contends the trial court erred in failing to award her child support and childcare costs retroactive to the date of Michael's birth. Brittany acknowledges that Christopher paid her

$11,300 voluntarily between February 2011 and January 2013, but sought an additional $4,912 in retroactive child support and $2,527.74 in childcare costs.

The law is firmly established that "children born out of wedlock are entitled to the same duty of support as children born in wedlock. . . . A child born out of wedlock is entitled to child support retroactively to the date of birth, because it is upon the child's birth that the parental duty of support commences." *Henke v. Guerrero*, 13 Neb. App. 337, 350, 692 N.W.2d 762, 776 (2005). It is "'entirely appropriate to use the guidelines in determining the amount of retroactive support to award a child born out of wedlock,'" and the guidelines are "'presumptively applicable in the setting of child support in a paternity action.'" *Weaver v. Compton*, 8 Neb. App. 961, 966, 605 N.W.2d 478, 483 (2000) (quoting *Sylvis v. Walling*, 248 Neb. 168, 532 N.W.2d 312 (1995)). In a paternity case, "Clearly, retroactivity is the law; therefore, the question boils down to whether a proper amount was awarded." *Lawson v. Pass*, 10 Neb. App. 510, 518, 633 N.W.2d 129, 136 (2001).

In *Lawson, supra*, we vacated a trial court's order, and remanded the cause, concerning retroactive support in a paternity case because there were no worksheets to support the amount awarded by the court and because the monthly amount established by the court for retroactive support was arbitrary without any supporting findings of fact. The parties had stipulated that the father's prospective child support obligation should be $295, but left the issue of retroactive support for the court to decide. The trial court used $295 per month retroactively for the father's support obligation, but there was

> no finding that this was done because of [a] stipulation, because that was the right amount calculated under the guidelines using actual earnings, or because it was based on earning capacity. In short, we do not know, although the trial court should tell us, why it used $295 per month for the retroactive support.

*Id.* at 518, 633 N.W.2d at 137. We concluded, "On remand, the trial court should complete the income and support calculations worksheet required by the guidelines to determine [the father's] retroactive child support obligations and attach it to its new judgment." *Id.* at 523, 633 N.W.2d at 140. We also directed the parties to "endeavor to create a complete record by supplying their completed worksheets." *Id.* One of the obvious purposes of the worksheet requirement is so that the appellate courts do not have to speculate about the trial court's conclusions. *Stewart v. Stewart*, 9 Neb. App. 431, 613 N.W.2d 486 (2000). "[T]rial courts must show the appellate courts, and the parties, that they have 'done the math.'" *Lawson*, 10 Neb. App. at 521, 633 N.W.2d at 139 (quoting *Stewart, supra*).

Christopher voluntarily paid Brittany a total of $11,300 in support between Michael's birth and trial, as no temporary order for support was entered. The decree in the instant case does not contain any specific findings regarding retroactive support even though it was requested; the decree simply provides that Christopher's child support obligation shall commence April 1, 2013, and that the party incurring childcare costs must present an invoice for those expenses within 15 days of incurring the costs, and the responsible party must pay within 15 days. The final provision of the decree states, "Any other or further request for relief made by either party, which is not specifically granted in this Decree of Paternity, is denied." There are no child support worksheets attached to the decree concerning retroactive support. We are therefore left to

speculate as to how the trial court must have concluded that $11,300 (the total amount Christopher had paid in support) was a sufficient amount of retroactive support for Michael from February 2011 (the first month after his birth) through March 2013 (the month prior to the entry of the decree). Taking the $11,300 and dividing by 26 months (February 2011 through March 2013) equates to an average of $434.62 per month, for both child support and childcare. As discussed next, this falls short of the amount owed under the guidelines just for child support.

Unlike the parties in *Lawson, supra*, Brittany did supply two child support worksheets for the court to utilize in awarding retroactive support. Brittany's first worksheet was based on the period in 2011 when she was a full-time student, using Christopher's income from his 2011 W-2, and reflects that his obligation would have been $693 per month from February 1, 2011, through September 2012, just for child support. Brittany's second calculation, for October 2012 forward, was based on Brittany's income as a registered nurse and Christopher's year-to-date income as of July 13, 2012, reflecting Christopher's obligation would have been $588 per month (this was the worksheet utilized by the court in establishing Christopher's obligation from April 2013 forward). We can see that in both timeframes, the average of $434.62 per month voluntarily paid by Christopher was less than the child support guidelines would have required, and also note that this amount does not factor in childcare costs. Pursuant to Brittany's worksheets, therefore, Christopher should have paid her a total of $16,212 in child support between Christopher's birth and trial. Brittany also offered into evidence copies of all the checks she paid for daycare while she was in nursing school and working as a nurse, reflecting she bore the entire cost of childcare in the amount of $4,681 between September 2011 and December 2012. After subtracting the $11,300 Christopher had already paid, Brittany requested that he be ordered to pay an additional $4,912 in retroactive child support (through January 2013) and childcare costs of $2,527.74 (54 percent of the total costs). Christopher did not submit any child support worksheets to the court to guide its determinations regarding child support.

In determining the amount of a child support award, this court has consistently held that the trial court must consider the status, character, and situation of the parties and attendant circumstances, including the financial condition of the parties and the estimated cost of support of the children. *Lawson v. Pass*, 10 Neb. App. 510, 633 N.W.2d 129 (2001). And, in discussing the lump-sum payment of child support which necessarily results from an order of retroactive support, "'the ability to pay is a paramount factor.'" *Henke v. Guerrero*, 13 Neb. App. 337, 348-49, 692 N.W.2d 762, 776 (2005) (quoting *Cooper v. Cooper*, 8 Neb. App. 532, 598 N.W.2d 474 (1999)). In the absence of a showing of bad faith, it is an abuse of discretion for a court to award retroactive child support when the evidence shows the obligated parent does not have the ability to pay the retroactive support and still meet current obligations. *Henke, supra.* In a paternity case, the father's inability to pay retroactive support means that after assessing the equities of the case, the court can deviate from the child support guidelines in setting retroactive support, and because it is an equity matter, the court can also order a payment plan for the retroactive support. *Id*.

Presumably, the trial court determined that Christopher did not have the ability to pay retroactive child support or childcare costs beyond the $11,300 he had already paid. Although Christopher offered no evidence of his monthly expenses or other obligations, he did testify he had some financial hardships because of an increase in food prices, the rate at which he was

unable to find extra duty, and a new car payment. However, without the trial court's having made any specific findings or attaching its own worksheet to the decree, we can only speculate as to the court's intentions. On remand, the trial court should complete the income and support calculations worksheet required by the guidelines to determine Christopher's retroactive support obligations from February 2011 through March 2013 and attach it to its new judgment. See *Lawson, supra.* After assessing the equities of the case and upon making specific findings, the court can then deviate from the child support guidelines in setting retroactive support, including childcare, if it finds that Christopher does not have the ability to pay retroactive support as otherwise required by the evidence. And because it is an equity matter, the court can also order a payment plan for the retroactive support, if applicable. See *Henke, supra.*

## CONCLUSION

We conclude the trial court did not abuse its discretion in awarding the parties joint legal custody of Michael, and affirm that portion of the decree. We reverse, and remand with directions the court's determination regarding Christopher's extended parenting time in Virginia. We affirm the order with regard to Christopher's child support (including deviation) and childcare obligations commencing from entry of the decree; however, we reverse, and remand with directions for further proceedings the issue of retroactive child support and childcare costs.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.